## FOX RIVER PAPER CORPORATION v. UNITED STATES.

No. 1955.

District Court, E. D. Wisconsin.

April 30, 1946.

Leo J. Federer and Edmund B. Shea, both of Milwaukee, Wis., for plaintiff.

Timothy Cronin, U. S. Atty., and E. J. Koelzer, Asst. U. S. Atty., both of Milwaukee, Wis., and Carroll Sizer, Sp. Asst. to the Atty. Gen., for defendant.

DUFFY, District Judge.

This is an action to recover income taxes alleged to have been overpaid in the two fiscal years ending November 30, 1939, and November 30, 1940, respectively.

On November 28, 1938, plaintiff · purchased the paper mill property and business of the Fox River Paper Company (hereinafter called "old company") which was located at Appleton, Wisconsin. The price paid was $1,250.000 in cash and 5,000 shares of plaintiff's preferred stock, plus approximately $430,000 in cash which was for inventories.

The question to be determined is the proper cost basis to be attributed to the property in question for the purpose of computing annual depreciation charges thereon. Plaintiff claims it is entitled to use a cost basis of $1,750,000, less an item of $26,973.70 which is not in dispute. The government seeks to uphold the action of the Commissioner of Internal Revenue in deducting $500,000 from the taxpayer's claimed cost basis. The Commissioner claimed that $250,000 of the total purchase price must be attributed to good will and other intangible assets which are not depreciable, and another $250,000 on the theory that the plaintiff's preferred stock was not worth over $50 per share on November 28, 1938.

It is my conclusion there was no justification for the Commissioner's conclusion that $250,000 of the total purchase price must be attributed to good will and other intangible assets. There was no basis for the amount fixed, except an arbitrary determination. The evidence discloses that no part of the purchase price was paid for good will.

In 1938 the reputation of the old company in the trade had been damaged severely by the use of inferior materials and short weights. The company was continuously losing old customers. The output in that year represented only one-third of the company's productive capacity. Its labor relations were poor. Because of the company's unfavorable reputation in the trade, plaintiff promptly adopted a new and distinctive "Master Line" watermark to differentiate its products from those

previously produced by the old company. The lack of a favorable record of earnings also negatives the existence of good will. There was credible testimony that the old company's connection with the new was a business liability for the latter, rather than an asset. I must sustain plaintiff's contention that the action of the Commissioner in attributing $250,000 to good will and other intangible assets was erroneous.

The proper basis upon which to calculate deductible depreciation of a property is its "cost." Sec. 23(n), Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 23(n). In addition to $1,250,000 in cash, the plaintiff paid as part of the cost 5,000 shares of its preferred stock. The remaining question therefore is: What is the amount of cost represented by those shares of preferred stock?

The applicable rule is stated in Montgomery: Federal Taxes on Corporations, Vol. 1, p. 268, " * * * the cost to a corporation of property acquired through the issuance of its capital stock is the fair market value of the stock at the time of issue." Many tests have been used to determine the fair market value of shares of stock. Where there have been sales in a free and open market, such sales are usually determinative, but there were no sales of stock of the old company upon a free and open market. In fixing the value we may, therefore, consider such elements as ask and bid prices, dividend paying record, capitalized earning value of underlying assets, cost of assets less depreciation, reproduction value of assets less depreciation, and opinion evidence.

The critical date is November 28, 1938, when the preferred stock was issued to the old company. Eleven days thereafter the old company formally authorized Wing, Sr., to dispose of this stock for $50 per share. In December, 1938, the old company offered this stock to Oberweiser at $60 per share. He testified he did not purchase because he had learned of the unfavorable position of the old company in the trade and he did not care to invest more capital in the new company until he was convinced its business operations would be successful. Considering this situation it seems quite clear that the preferred stock was not worth $100 per share as contended by the taxpayer.

Unsuccessful efforts were made from December, 1938, to October, 1940, to dispose of this preferred stock. Wing, Jr., tried to sell it at $50 per share but without success. It was finally sold on October 11, 1940, to Oberweiser as agent for the taxpayer, at $50 per share.

The sale of this stock in October, 1940, at $50 per share represented not only the opinion of the directors of the old company but also that of E. J. Dempsey, the attorney for the old company, and Harris Hall Investment Company which negotiated the sale of the mill properties in the first instance.

It is true that there had been a change in conditions between November 28, 1938, and October, 1940. The court will take judicial notice that the treaty at Munich had been concluded in September, 1938, and most of our people believed that a period of peace for the peoples of the world lay ahead; but in September, 1939, World War II had commenced, and in May, 1940, France fell to the Germans. At the time the stock was sold to Oberweiser feverish preparations for defense were under way in this country, and in general the cost of living was on the upgrade.

Furthermore, the earnings of the taxpayer were on the increase. For the year ending November 30, 1939, earnings were $12,585.12; for the following year, $104,249.93; and for the year ending November 30, 1941, the earnings of the new company were $219,264.82. Another important factor is that on October 11, 1940, the ownership of the preferred stock carried with it the control of the new company because dividends had not been paid on such stock for a period of two years.

Under all the circumstances and after giving consideration to taxpayer's testimony as to the assets underlying the preferred stock, I conclude that the value of this stock on November 28, 1938, was not in excess of $50 per share.

I am filing contemporaneously herewith findings of fact and conclusions of law. The attorney for the plaintiff will prepare

the judgment in conformity herewith, first submitting same and the calculations upon which it is based to the attorney for the defendant.