### TENNESSEE PRODUCTS CORP. v. UNITED STATES.

No. 47514.

United States Court of Claims.

Oct. 7, 1952.

This is a suit for refund of income and excess profits taxes for the years 1939, 1940, and 1941. All the questions in the case have been settled by agreement of the parties with one exception. The taxpayer contends that certain property was obtained by it in 1917 from William J. Cummins, in exchange for its capital stock; that in computing its excess profits tax credit for 1941, it was entitled to include this property as part of its equity invested capital at a value equivalent to the fair market value of the stock issued to Cummins in the exchange;

and that the fair market value of the stock at the time of the transaction was not less than $70 a share or a total of $3,500,000.

It is defendant's position that the property must be treated as property paid in for cash because in fact it was acquired by Cummins as agent of the taxpayer for the cash sum of $2,126,039.68. Defendant also insists that inasmuch as for the purpose of other taxable years the taxpayer successfully persuaded the Commissioner of Internal Revenue (1) to regard the property as having been obtained for cash through Cummins as its agent, and (2) to value it at its total purchase price for invested capital purposes, the taxpayer is estopped in the present action to contend for equity invested capital purposes that the property was paid in for stock. In the event these arguments are rejected, defendant asserts that the evidence offered by the taxpayer is insufficient to establish the fair market value of the stock in 1917.

The court, having considered the evidence, the report of Commissioner George H. Foster, the briefs and argument of counsel, makes the following

### Special Findings of Fact

1. The taxpayer is a corporation organized July 20, 1917, under the laws of the State of Tennessee as the Bon Air Coal & Iron Corporation, which name was later changed to Tennessee Products Corporation. The taxpayer's principal office and place of business was at Nashville, Tennessee. During 1939, 1940, and 1941 plaintiff filed its Federal tax returns on a calendar-year basis and employed the accrual method of accounting.

2. By decree of the Chancery Court for Davidson County, Tennessee, in the cause of Union Bank & Trust Company, Trustee, et al., complainants, v. Bon Air Coal and Iron Company, et al., defendants, entered in Decree Minute Book 95, pages 355 et seq., there was confirmed on June 15, 1917, a sale at public auction to William J. Cummins of 174 tracts or parcels of land, with improvements thereon, lying in the State of Tennessee, together with certain personal property. The property had belonged to

Bon Air Coal and Iron Company, which was in receivership.

3. Prior to the sale to Mr. Cummins, the clerk and master of the sale advertised the sale of the property, by sealed bids and outcry, in newspapers published in Nashville, Tennessee; Boston, Massachusetts; Chicago, Illinois; Philadelphia, Pennsylvania; Portland, Oregon; New York City; and San Francisco, California. At the sale, no bids at all were received on some of the parcels of the property, and the highest bids received on other parcels were from the creditors of the company in receivership. Thereafter, on May 25, 1917, Mr. Cummins submitted a sealed bid on all the properties as a whole, except the personal property, as a result of which the biddings on all the properties previously sold on April 2, 1917, were reopened. The properties, including the personal property, were then sold to Mr. Cummins, no other bids having been received which were higher than the bids of the creditors except as to parcel D, which was subject to the lien of the mortgage held by the New York Trust Company, Trustee, and which was bought by J. M. Overton, Trustee. The sale to Cummins was approved by the court on June 15, 1917.

The property was purchased by said William J. Cummins for the lump sum of $1,476,039.68, to which court costs, payment of bond interest, satisfaction of liens and other costs incident to the sale were added, making the total price paid $2,126,039.68. Although Mr. Cummins was treated as a principal by the court in the purchase of the properties, he was acting as agent for others, principally John McE. Bowman of New York.

4. Following the organization of plaintiff corporation, and at the first meeting of the incorporators and board of directors on July 20, 1917, William J. Cummins proposed to said corporation that he assign, transfer and convey to it the aforesaid properties in consideration of the issuance by the corporation, and delivery to him or to his order, of the entire capital stock consisting of $7,500,000 par value preferred and $12,500,000 par value common, subject to an immediate assignment and transfer by Cummins to the treasurer or other designated depository of

$2,500,000 of preferred and the same amount of the common stock. This offer was accepted. Pursuant to the offer, $2,500,000 of preferred and $2,500,000 of common stock were transferred to the treasurer of the corporation and held as treasury stock, and also pursuant to the direction of Cummins the remainder of the stock was issued to John McE. Bowman of New York, except 500 shares of common stock retained by Cummins. The incorporators and first board of directors were R. M. Dudley, A. W. Shryer, Houston Dudley, James W. McConnell and C. R. Cockle.

5. The preferred stock which was issued to John McE. Bowman was transferred according to the stock book of the corporation, as follows: 49,650 shares in the name of John McE. Bowman, Trustee; 150 shares in the name of Charles Cockle; 50 shares in the name of Albert W. Shryer; 100 shares in the name of Oliver J. Timothy; and 50 shares in the name of James W. McConnell. As of September 18, 1917, all of the stock originally issued to John McE. Bowman, Trustee, had been transferred. As of October 18, 1917, according to said stock book, 20,350 shares of such preferred stock had been transferred to William Wrigley, Jr., of Chicago, and as of December 7, 1917, 18,350 shares remained in the name of Mr. Wrigley. Mr. Wrigley had become a member of a syndicate with John McE. Bowman in connection with this stock and agreed to assume the liability of Mr. Bowman on the purchase money notes signed by William J. Cummins as principal and John McE. Bowman as surety, covering the purchase price of the properties at the receivership sale. Wrigley sold 1,000 shares of his preferred stock to J. H. Patrick (a close personal friend of Mr. Wrigley's, who lived in his household), on November 5, 1917, at $56.85 a share; and 1,000 shares to his son-in-law, J. R. Offield, on November 14, 1917, at the same price. Subsequently, on April 16, 1918, he transferred 225 shares to N. L. Buck, a vice president of William Wrigley, Jr., Company, at the same price, and 75 shares to James C. Cox, a vice president, at the same price.

6. There is the following evidence available of the fair market value of the stock of

Bon Air Coal and Iron Corporation during the latter part of 1917. The preferred stock was offered for sale by Chicago brokers in August 1917 at a price of $80 per share, carrying with it a bonus of 25 percent in common stock, and the record establishes a number of sales to individuals on that basis. There were a few sales in the latter part of 1917 at a price which, if no part of the purchase price be attributed to the common stock, amounted to approximately $70 per share for the preferred. Each share of preferred, however, carried with it common stock on the basis of up to two shares of common for each share of preferred. In January 1918 there was a substantial sale to Jacob Ruppert which is shown by his account to have been on this basis:

| | |
|---|---|
| 5,000 shares of preferred | $344,750 |
| 350 shares of common at $15 per share | 5,250 |
| | 350,000 |

carrying a bonus of 5,650 shares of common

If no part of the purchase price be attributed to the 6,000 shares of common stock involved, the preferred was sold at $70 per share; however, if all the common stock be valued at $15 per share, the cost of the preferred was $52 per share.

7. At the time of the determination of its tax liabilities for 1917, the taxpayer claimed that the properties possessed by it were purchased by Mr. Cummins on June 15, 1917, for and on behalf of John McE. Bowman; that while at the time of the purchase the corporation was contemplated, it was not organized because Mr. Bowman and his associates did not know whether they would be the successful bidders at the foreclosure sale, and that immediately after the purchase of the property, on June 16, 1917, the books of the corporation were opened although the charter was not granted by the State of Tennessee until July 20, 1917. Upon these representations, the Commissioner of Internal Revenue accepted the claim of the taxpayer that its taxable period was June 16, 1917, to December 31, 1917, instead of July 20, 1917, to December 31, 1917, and computed its income and invested capital for this period. As a result, no excess profits tax was determined to be due for this period since the excess profits credit computed on the invested capital prorated for the taxable period, plus the specific exemption allowed by the Revenue Act of 1917, exceeded the taxable income.

8. In the determination of Federal taxes of this taxpayer for the years 1917 through 1938, the Commissioner of Internal Revenue used for invested capital purposes and for determination of allowable deductions from taxable income for depletion and depreciation the amount of $2,126,039.68, which sum had been agreed upon by the taxpayer and the Commissioner after a conference as the cost to the taxpayer of the properties purchased during the year 1917.

9. The allocation of the purchase price among the various properties, made by the taxpayer and used by the Commissioner, is as follows:

| | |
|---|---|
| Surface lands 125,000 acres at $3.00 | $375,000.00 |
| Coal, 7,500,000 tons at 3 cents per ton | 225,000.00 |
| Coal development | 100,000.00 |
| Ore, 3,000,000 tons at 16⅔ cents per ton | 500,000.00 |
| Ore development | 10,000.00 |
| Timber, 75,000,000 ft. at $3.00 per M | 225,000.00 |
| Buildings | 200,000.00 |
| Machinery and equipment | 427,735.69 |
| Merchandise | 27,388.13 |
| Supplies | 35,915.86 |
| Total | 2,126,039.68 |

10. The taxpayer's Federal income and excess profits tax return filed for the year 1939 reported a net loss and no taxes due. Thereafter, the Commissioner determined a taxable net income of $8,673.23 for the year 1939, and an income tax liability of $1,139.25, which, together with interest of $232.16, was duly assessed against the taxpayer. The income tax deficiency was paid by the taxpayer on September 13, 1943, and the interest was paid on September 22, 1943. On March 13, 1944, the taxpayer filed a claim for refund, and on December 3, 1945, filed another claim for refund for the year 1939. The claims for refund were grounded upon

the assertions that (1) the cost basis of lands sold was the market value at date of acquisition plus undepleted development cost, for purpose of determining gain or loss on the sale; (2) the actual amount of interest accruable on notes payable should be allowed as deduction from income; and (3) net operating loss for the year 1939 was allowable as a carry-over deduction for the year 1940. By letter dated August 8, 1947, the taxpayer was notified by registered mail of the disallowance in full of the aforesaid claims for refund.

11. On May 15, 1941, the taxpayer filed its Federal income and excess profits tax returns for the year 1940, reporting thereon a net income of $317,668.10 and an income and income defense tax liability of $76,240.-34, together with interest of $35.61. This tax was paid as follows: $15,500 on March 14, 1941, $3,595.70 on May 17, 1941, $19,-060.09 on June 20, 1941, $19,060.08 on September 18, 1941, and $19,060.08 on December 19, 1941. On September 9, 1942, the taxpayer filed amended income and excess profits tax returns for the year 1940, reporting thereon taxable net income of $254,-131.35 and income and income defense tax of $60,991.53. The taxpayer also, on September 9, 1942, filed a claim for refund for $15,248.81, the difference between the tax shown to be due by the original return and that by the amended return. Thereafter, the Commissioner determined a taxable net income of $357,974.21 for the year 1940 and a deficiency in income and income defense tax of $9,673.47, which was duly assessed, together with interest of $1,390.85. The taxpayer paid the income tax deficiency on September 13, 1943, and the interest on September 22, 1943. The taxpayer was notified by registered mail dated December 27, 1943, of the disallowance in full of its claim for refund filed for the year 1940. On March 13, 1944, and on December 3, 1945, the taxpayer filed claims for refund for the year 1940. The taxpayer was notified by registered mail under date of August 8, 1947, of the disallowance in full of these two claims for refund. The claims for refund were grounded upon the assertions that (1) the net operating loss carry-over from the year 1939 was deduct-

ible from income for the year 1940; (2) the cost basis of lands sold was the market value at date of acquisition plus undepleted development cost, for purpose of determining the gain or loss on the sale; (3) the actual amount of interest accruable on notes payable should be allowed as deduction from income; and (4) the expenditures in clearing a leased mine for operation were deductible repairs and not capital expenditures.

12. The taxpayer, on June 15, 1942, duly filed its corporation income and excess profits tax returns for the year 1941, reporting thereon taxable income of $867,816.-78 and income tax liability of $268,773.20, which was duly assessed. On September 9, 1942, the taxpayer filed an amended return, reporting net income of $862,909.97 and a tax liability of $267,252.09. The difference between the tax shown to be due on the original return and the amended return in the amount of $1,520.11 was abated January 2, 1943. The taxpayer paid the tax reported for the year 1941 as follows: $91,750.00 on March 20, 1942, $42,636.60 on June 19, 1942, $67,193.30 on September 22, 1942, and $67,193.30 on December 23, 1942. In this return plaintiff claimed an equity invested capital of approximately $4,000,000. Thereafter, the Commissioner determined a taxable net income for the year 1941 of $1,027,-151.01 and a deficiency in income tax of $38,104.30 with interest thereon of $3,192.41 and excess profits tax of $41,320.70 with interest thereon of $3,461.88. The taxpayer paid the income tax and excess profits tax on September 13, 1943, and the interest thereon on September 22, 1943. The taxpayer, on May 5, 1944, March 23, 1945, and December 3, 1945, filed five claims for refund for the year 1941. The claims for refund were grounded upon the assertions that (1) for equity invested capital purposes, the cost of assets purchased in 1917 was not the purchase price but the subsequent market value of its issued stock; (2) money paid in by its stockholders to get new stock at time of reorganization was includible in equity invested capital; (3) the cost basis of lands sold was the market value at date of acquisition plus undepleted development cost, for purpose of determining gain

or loss on the sale; (4) the actual amount of interest accruable on notes payable should be allowed as deduction from income; (5) the expenditures in clearing a leased mine for operation were deductible repairs and not capital expenditures; (6) unused excess profits credit for the year 1940 should be carried over and allowed for the year 1941; and (7) the taxpayer is entitled to an additional deduction from income because of change to last-in, first-out inventory method. By registered mail dated August 8, 1947, the Commissioner notified the taxpayer of the disallowance in full of all five claims for refund.

13. During the years 1939, 1940, and 1941, the taxpayer sold 9,001.875 acres of land upon which losses were sustained. By agreement of the parties, it has been determined that the net loss sustained from the sale of lands during the year 1939 amounted to $29,604.80, of which the Commissioner had previously allowed $22,847.78, leaving an additional loss to be allowed as a deduction from income for that year of $6,757.02. For the year 1940, the agreed net loss sustained from land sales was $2,317.35, of which $2,270.79 had been previously allowed, thus leaving $46.56 as the additional amount to be allowed as a deduction from income for that year. For the year 1941, the agreed net loss sustained from land sales was determined to be $8,922.91, of which $6,930.14 was previously allowed, thus leaving $1,992.77 as the additional amount allowable as a deduction from income for that year. In determining these agreed net losses allowable as deductions from income, the basis of the lands sold was the original allocation of the purchase price of the properties.

14. Under date of December 1, 1937, the taxpayer issued notes payable to the Whitwell Smokeless Fuel Company in the principal amount of $113,798.80 at 6 percent interest. On December 31, 1940, the accrued interest on these notes amounted to $21,-032.83, on which date the holders of the notes accepted 4,206 shares of the taxpayer's $5-par-value common stock, in liquidation of all interest then accrued on the notes. The market value of the stock on that date was $2.25 per share, or a total of $9,463.50

for the 4,206 shares. The taxpayer claimed deductions from income of $6,827.88 for the year 1939 and $6,805.25 for the year 1940, as accrued interest payable on these Whitwell notes, of which $2,056.63 was allowed as a deduction from income for the year 1939 and none for the year 1940. The parties have agreed to deductions from income of the amounts of accrued interest claimed by the taxpayer, which results in an additional deduction of $4,761.25 for the year 1939, and $6,805.25 for the year 1940.

15. In paragraph 18 of its petition, the taxpayer claimed as additional equity invested capital the difference between the par value and the market value of the 4,206 shares of common stock issued in liquidation of the accrued interest on the notes payable to the Whitwell Smokeless Fuel Company. The Commissioner of Internal Revenue allowed as an addition to equity invested capital $9,463.50, the market value of the stock. The taxpayer withdraws its claim for additional invested capital based upon the par value of the stock issued in payment of the interest accrued on the Whitwell notes and dismisses the issue from the case.

16. In 1940, the taxpayer leased a tract of coal-bearing land from the Tennessee Coal, Iron and Railroad Company (or its subsidiary), which adjoined property the taxpayer or its predecessors had leased from that company (or its subsidiary) for many years previously. This newly leased land was not in a virgin state but had been operated by Tennessee Coal, Iron and Railroad Company or a lessee of said company, prior to 1920, in which year mining had been discontinued. In order to reach the solid coal in this tract, the taxpayer entered the property through entries of the old abandoned mine thereon. These entries had deteriorated to an unworkable state and had to be cleaned. Rock, dirt, and coal, caused by falls of roof and caved ribs, had to be removed, water had to be pumped out, new track and rail laid and new timbering had to be installed. The taxpayer incurred expenditures of $15,255.48 in 1940 and $34,-501.51 in 1941 for the labor and materials used in reestablishing the entries, which expenditures were treated as capital ex-

penditures by the taxpayer in its Federal income tax returns filed for these two years. The parties have agreed that these expenditures constitute capital investment to be recovered, in part, through the process of depreciation and, in part, through the process of depletion; that of the total amount of $15,255.48 expended in 1940, $8,474.19 comprised depreciable assets and $6,781.29 comprised depletable assets; that the sum of $8,474.19 be returned through the process of depreciation allowances at the rate of 10 percent per year, which would amount to a deduction of $423.71, average for the year 1940, and $847.42 for the year 1941; and that the sum of $6,781.29 be returned through the process of depletion allowances, beginning on January 1, 1942; that of the total amount of $34,501.51 expended in 1941, $21,326.64 comprised depreciable assets and $13,174.87 comprised depletable assets; that the sum of $21,326.64 be returned through the process of depreciation allowances at the rate of 10 percent per year, which would amount to a depreciation of $1,066.33, average for the year 1941; and that the sum of $13,174.87 be returned through the process of depletion allowances, beginning January 1, 1942.

17. The parties have agreed that because of a change to the last-in, first-out inventory method, and the subsequent replacement in 1942 and 1945 of products involuntarily liquidated in 1941 the claimed amount of $18,438.58 is an allowable deduction from income for the year 1941.

18. The parties have agreed that the taxpayer's invested capital was understated $3,000, in connection with the money paid in by former owners of common stock in order to get new stock under the reorganization plan, which took place in 1936 under Section 77B of the Bankruptcy Act, 11 U.S.C. A. § 207, and this amount is includible in equity invested capital for the years 1940 and 1941.

19. The fair market value of the 50,000 shares of preferred stock issued by Bon Air Coal & Iron Corporation for the properties acquired on July 20, 1917, was $67.50 per share on that date, or a total value of $3,375,000.

William Waller and John P. Davis, Nashville, Tenn., Waller, Davis & Lansden, Nashville, Tenn., on the brief, for plaintiff.

Elizabeth B. Davis, Washington, D. C., Ellis N. Slack, Acting Asst. Atty. Gen., Andrew D. Sharpe, Washington, D. C., on brief, for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

The plaintiff, a Tennessee corporation organized July 20, 1917, as the Bon Air Coal & Iron Corporation, which name was subsequently changed to Tennessee Products Corporation, seeks in this action to recover a refund of income and excess profits taxes for the years 1939, 1940, and 1941. As set forth in detail in the findings, the parties have agreed upon the adjustments to be made in most of the controverted items. The only issue which remains for consideration is the determination of the amount of "equity invested capital" to be used in computing plaintiff's excess profits tax credit for 1941. In resolving this issue certain applicable provisions of the Internal Revenue Code and of the Treasury Regulations must be considered. Section 718 of the Internal Revenue Code, added by Sec. 201, Title II, of the Second Revenue Act of October 8, 1940, 54 Stat. 974, as amended, 26 U.S.C. (Supp. II, 1940 Ed.) § 718,[1] defines equity invested capital as follows:

"Equity Invested Capital.

"(a) Definition.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

"(1) Money Paid In.—Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital;

"(2) Property Paid In.—Property (other than money) previously paid in

1. This section was repealed by the Act of November 8, 1945, ch. 453, Title I, § 122(a), 59 Stat. 568.

(regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. If the property was disposed of before such taxable year, such basis shall be determined in the same manner as if the property were still held at the beginning of such taxable year. If such unadjusted basis is a substituted basis it shall be adjusted, with respect to the period before the property was paid in, in the manner provided in section 113 (b)(2); * * *".

Section 30.718–1 of Treasury Regulations 109, supplementing § 718, provides as follows:

"Sec. 30.718–1 [As amended by T.D. 5059, 1941–2 Cum.Bull. 125]. *Determination of daily equity invested capital —Money and property paid in.*—The equity invested capital for any day is determined as of the beginning of such day. The basis or starting point is found in the amount of money and property previously paid in for stock, or as paid-in surplus, or as a contribution to capital. The terms 'money paid in' and 'property paid in' do not include amounts received as premiums by an insurance company subject to taxation under section 204. For the purpose of determining equity invested capital, the amount of any property paid in is the unadjusted basis to the taxpayer for determining loss upon a sale or exchange under the law applicable to the taxable year for which the invested capital is being computed. If the property was disposed of before such taxable year, such unadjusted basis shall be determined as if the property were still held at the beginning of such taxable year.

"If the basis to the taxpayer is cost and stock was issued for the property, the cost is the fair market value of such stock at the time of its issuance. If the stock had no established market value at the time of the exchange, the fair market value of the assets of the company at that time should be determined

and the liabilities deducted. The resulting net worth will be deemed to represent the total value of the outstanding stock. In determining net worth for the purpose of fixing the fair market value of the stock at the time of the exchange, the property paid in for such stock shall be included in the assets at its fair market value at that time. * * *"

In preparing its 1941 excess profits tax return, the taxpayer included within its computation of equity invested capital certain property obtained by it in 1917 as "property previously paid in for stock," and placed thereon a value allegedly equivalent to the fair market value of the stock issued in exchange for the property at the time of exchange. However, upon auditing this return the Commissioner of Internal Revenue rejected the taxpayer's computation of equity invested capital on the ground that this property was paid in for the cash sum of $2,126,039.68 rather than in exchange for stock having a substantially higher market value. In accordance with this conclusion, the Commissioner redetermined the taxable net income of the corporation for 1941, and imposed a deficiency assessment which was satisfied in September 1943. Claims for refund were thereafter filed, but were disallowed by the Commissioner August 8, 1947.

The property in question was obtained by the taxpayer under the following circumstances. On June 15, 1917, the Chancery Court for Davidson County, Tennessee, confirmed the sale at public auction of certain personal property and of 174 tracts of land belonging to the Bon Air Coal & Iron Company to the highest bidder, William J. Cummins, for the lump sum of $1,474,039.68. The satisfaction of liens and the payment of court costs, bond interest, and other expenses incident to the sale increased the total purchase price to $2,126,039.68. Cummins appeared to be purchasing this property on his own behalf, and was so treated by the court, but in fact he was acting as agent for John McE. Bowman of New York.

On July 20, 1917, a charter was issued by the State of Tennessee to the Bon Air Coal & Iron Corporation. On this date Cummins

appeared before the first meeting of the incorporators and board of directors and offered to transfer to the corporation the aforementioned properties in consideration of the issuance by the corporation to him, or to his order, of the entire capital stock consisting of $7,500,000 par value preferred and $12,500,000 par value common, subject to the immediate reassignment by him of a portion of this stock to the treasurer of the corporation. This offer was accepted, and thereafter, with the exception of $2,500,000 of preferred stock and $2,500,000 of common stock transferred to the treasurer and held as treasury stock and of 500 shares of common stock retained by Cummins, the entire capital stock of the corporation was issued to Bowman upon the order of Cummins.

The taxpayer insists that these facts surrounding the acquisition of the property establish that the property was paid in for stock, and that, accordingly, under Sec. 30.718–1 of Treasury Regulations 109, supra, it was correct in placing upon the property for equity invested capital purposes a value equal to the fair market value of the stock issued in exchange.

The defendant asserts that the taxpayer is estopped to make this argument for two reasons. In the first place, defendant says that inasmuch as the taxpayer successfully persuaded the Commissioner of Internal Revenue to accept its contentions in connection with the computation of its 1917 income and excess profits taxes that Cummins was acting as agent for the corporation in purchasing the property, and that the date of June 16, 1917 should be used as the beginning of the corporation's taxable year, it should not now be permitted to take the position that the property was paid in for stock. In the second place, defendant urges that an agreement entered into between the taxpayer and the Commissioner of Internal Revenue as to the cost to the taxpayer of the property, whereby the Commissioner in determining the taxpayer's Federal taxes from 1917 through 1939, used for invested capital purposes and for the determination of allowable deductions from taxable income for depletion and depreciation the amount of $2,126,039.68, that is, the total

purchase price paid by Cummins, should estop the taxpayer from now attempting to place a different valuation upon the property.

■ A review of the statements made by the taxpayer to the Commissioner in connection with the determination of its 1917 taxes, convinces us that they are not inconsistent with the present position taken by the taxpayer that the property was obtained from Cummins in exchange for stock, and that, accordingly, defendant's first ground of estoppel is without merit. The only purpose of these statements was to convince the Commissioner that for the purpose of computing its Federal taxes for 1917, the taxpayer should be regarded as having commenced its corporate existence on June 16, 1917, instead of on July 20, 1917. To substantiate this contention, the taxpayer stated to the Commissioner that the property was purchased at foreclosure sale by Cummins, on June 15, 1917, and that although Cummins appeared to be buying on his own behalf, he was actually acting as agent of Bowman. In addition, the taxpayer clearly pointed out to the Commissioner that while the corporation was contemplated at the time of the purchase, it was not in fact organized because Bowman did not know whether or not his agent, Cummins, would be the successful bidder. The taxpayer also stated that the books of the corporation were opened on June 16, 1917, the day after the purchase of the property, although a charter was not obtained from Tennessee until July 20, 1917. From these statements the Commissioner determined only that the taxpayer might properly date its corporate existence from June 16, 1917. Contrary to defendant's contention, the Commissioner did not conclude that Cummins purchased the property as agent of the taxpayer. Hence, there is nothing in the 1917 agreement which serves to estop plaintiff from asserting in this case that the property was secured in exchange for stock.

■ Moreover, the several steps whereby the taxpayer acquired the property appear to have been clearly and correctly defined in these statements, and cannot be ignored by the court in determining the taxpayer's equity invested capital under Sec.

718. Black Hills Power & Light Co., 14 T. C. 1425, 1427. The facts now before the court corroboate the taxpayer's statements to the Commissioner that the property was first acquired by Cummins as the *alter ego* of Bowman, at a time when the taxpayer was not in existence, and that after the corporation had been organized the property was in fact transferred to the corporation in exchange for the major portion of its capital stock pursuant to the offer made by Cummins, as agent of Bowman, on July 20, 1917. Having been obtained under these circumstances, the property was unquestionably property paid in for stock and, consequently, was properly included by the taxpayer in equity invested capital at a value equal to its cost, which, under the provisions of Sec. 30.718–1 of Treasury Regulations 109, supra, must be taken as the fair market value of the stock issued in the exchange.

In reaching this conclusion we must reject defendant's contention that an estoppel also arises from the fact that the taxpayer accepted the use by the Commissioner of the $2,126,039.68 purchase price, paid by Cummins, in determining invested capital and in determining allowable deductions from taxable income for depletion and depreciation during the taxable years from 1917 through 1938. It is well established that an administrative determination by the Commissioner of the value of property for the purpose of one tax statute or for the purpose of one taxable year, is not determinative of the value of that property for the purpose of another tax statute or of a different taxable year. Chiquita Mining Co. v. Commissioner, 9 Cir., 148 F.2d 306; Williams v. Commissioner, 8 Cir., 44 F.2d 467, affirming 15 B.T.A. 227; Dr. G. H. Tichenor Antiseptic Co. v. United States, D. C., 77 F.Supp. 288; Clarence Whitman & Sons, Inc., 10 T.C. 264; Northport Shores, Inc., 31 B.T.A. 1013; cf. Commissioner v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898. The taxpayer was free, therefore, to insist that a different value be placed upon the property in making a determination of its value for excess profits tax purposes under Sec. 718, supra.

The next matter for determination is the value which plaintiff was entitled to place upon this property in computing its equity invested capital. Under Sec. 30.718–1 of Treasury Regulations 109, supra, where, as in the instant case, the basis of the property to the taxpayer is cost, and the property was paid in for stock, the property may be included in equity invested capital in an amount equal to "the fair market value of such stock at the time of its issuance." In order to establish the fair market value the taxpayer has furnished us with all the available evidence of sales of the stock during this period. No contrary evidence as to value, other than as hereinbefore referred to, has been offered by defendant. While defendant insists that the evidence offered by the taxpayer does not conclusively establish the fair market value at the time of the exchange, we are of the opinion that the statute and the regulation contemplate the exercise of fair and reasonable judgment by the court in finding from all the facts and circumstances of the case, what the fair market value of the stock was at the date of exchange. Penney & Long v. Commissioner, 4 Cir., 39 F.2d 849; cf. Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991. The preferred stock of the corporation was offered for sale by Chicago brokers, in August 1917, at a price of $80 per share, carrying with it a bonus of 25 percent in common stock, and a considerable number of sales were made to individuals at this price. In the latter part of 1917 a few sales of preferred stock were consummated through the brokers at a price, which if no part of the purchase price be attributed to the bonus of common stock, amounted to approximately $70 per share for the preferred. During the period from November 1917 through the early part of 1918, 2,300 shares of preferred stock were sold at $56.85 per share. In addition, in January 1918, a bloc of 5,000 shares of preferred stock, carrying with it a large bonus of common stock, was sold to Jacob Ruppert for $350,000, which, assuming that the common stock was without value, amounted to $70 per share. Taking into consideration this range of sales which affords the best available criteria of the market price of the stock, Hazeltine Corp. v. Commissioner, 3 Cir., 89 F.2d 513; Commissioner v. Swen-

son, 5 Cir., 56 F.2d 544, 545; O'Meara v. Commissioner, 10 Cir., 34 F.2d 390; Fox River Paper Corp. v. United States, 10 Cir., 65 F.Supp. 605, 606; Difco Laboratories, Inc., 10 T.C. 660; Frank J. Kier, 28 B.T.A. 633; and taking into consideration the circumstances surrounding those sales, as revealed more fully in the findings of fact, we conclude that the fair market value of the 50,000 shares of preferred stock issued by the taxpayer in exchange for the property in question was $67.50 per share. Thus, in computing its equity invested capital, the taxpayer was entitled to value the property at $3,375,000.

The taxpayer is entitled to receive a refund of its excess profits taxes for the year 1941, computed upon the basis of an equity invested capital figure containing the amount of $3,375,000 for property paid in for stock. The taxpayer is also entitled to receive refunds of income and excess profits taxes computed upon the basis of the agreements entered into by the parties, and set forth in the findings of fact. The entry of judgment is suspended to await the filing by the parties of a computation and stipulation showing the exact amount due plaintiff, computed in accordance with the findings and foregoing opinion. It is so ordered.

JONES Chief Judge, and HOWELL, MADDEN, and WHITAKER, Judges, concur.