P & R Investors, Inc. v. Commissioner.
P & R Investors, Inc. v. Commissioner
Docket No. 593-62.
United States Tax Court
T.C. Memo 1963-284; 1963 Tax Ct. Memo LEXIS 63; 22 T.C.M. (CCH) 1462; T.C.M. (RIA) 63284; October 16, 1963
Ronald M. Mankoff and Wentworth T. Durant, 2323 Fidelity Union Tower, Dallas, Tex., for the petitioner. Thomas J. Moroney, Jr., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in petitioner's income taxes, as follows: Taxable Years Ended
Deficiency
June 30, 1958
$16,088.75
June 30, 1959
35,305.01
June 30, 1960
15,067.04
The issues presented for decision are: (1) Whether certain purchases made by petitioner from Leon B. Pullen of Central American Life Insurance Company *64 stock were arm's length transactions; and (2) whether the prices paid for such stock constituted the petitioner's basis in determining gains realized. Findings of Fact Some of the facts were stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. P & R Investors, Inc., (hereinafter referred to as the petitioner) is a corporation duly organized and existing under the laws of the State of Texas, with its principal office and place of business located at 412 Central American Life Building, Lubbock, Texas. It filed its corporate income tax return for the taxable years ended June 30, 1958, June 30, 1959, and June 30, 1960, with the district director of internal revenue at at Dallas, Texas. Petitioner was on the accrual basis of accounting. Petitioner's certificate of incorporation was issued by the Secretary of State of Texas on July 5, 1957. Its incorporators were Leon B. Pullen, T. J. Rollins and Harold Harriger, who also comprised the initial board of directors. The stated purpose of petitioner was "to accumulate and lend money and to purchase, sell and deal in notes, stocks, bonds and other securities, *65 but without banking privileges." Leon B. Pullen (hereinafter referred to as Pullen) organized the Central American Life Insurance Company (hereinafter referred to as Central American) as a Texas corporation in 1951. Pullen was the president and principal stockholder of Central American until sometime subsequent to the incorporation of petitioner. In 1953, Pullen borrowed $167,350 from the Citizens National Bank of Lubbock, Texas, for the purpose of purchasing the outstanding stock of Citizens Security Life Insurance Company. During 1953, Citizens Security Life Insurance Company was merged with Central American. Also in 1953, Pullen borrowed an additional sum of $23,020 from the Citizens National Bank. From 1953 through 1956, Pullen purchased approximately 600 shares of stock of Central American from other shareholders. Funds to make these purchases were likewise obtained from the same bank. In 1953, Central American stock was valued at $16 per share for purposes of the merger with Citizens Security Life Insurance Company. Between 1953 and 1957, Central American grew substantially, as follows: 1953
1957
Admitted assets
$ 626.389
$ 4,391.932
Insurance in force
15,567,452
31,574,775
Capital and surplus
166,379
283,060
Life reserves
249,977
3,901,243
*66 By 1956 or early 1957, Central American stock was selling for as high as $150 per share. The price of the stock rose consistently because it was known to be a progressive company with good management. On January 22, 1957, Central American declared a 10 for 1 split of stock, and subsequently granted to shareholders the right and option to purchase one share of Central American stock for each 10 shares of Central American stock held at a price of $20 per share. An option price of $24 per share had been suggested by some of the directors of Central American. However, $20 per share was finally agreed upon as the option price. By virtue of such stock option, Pullen received the right to purchase 6,000 additional shares of Central American stock at $20 a share. To make this purchase Pullen borrowed an additional $120,000 from the Citizens National Bank of Lubbock and exercised his option by so purchasing his allotted 6,000 shares. In addition, he bought 800 shares of Central American stock which were not purchased by other shareholders who could have exercised their stock options but did not do so. By September 1957, justa few weeks after the split, some Central American stock was sold *67 for $25 a share. As a result of the various sums borrowed by Pullen from the Citizens National Bank from 1953 through 1957, Pullen's loan balance in 1957 reached an aggregate of $465,000, all of which was secured by Central American stock. In 1957, the bank recommended to Pullen that he dispose of part of his Central American holdings to reduce his loan balance in such a way that it would not detrimentally affect the value of Central American stock. The bank's recommendation culminated in the incorporation of petitioner on July 5, 1957. Pullen initially subscribed to 99.8 percent of petitioner's capital stock. Subsequent sales of petitioner's authorized but unissued shares reduced Pullen's interest to 54.923 percent by March 1959. His interest was further reduced by September 1959 to 50.98 percent and by November 1959 sales of newly authorized stock reduced Pullen's interest in petitioner to 12.348 percent. Pullen was an original office of petitioner and thereafter periodically served as an officer. From 1953 through 1957, Central American acted as its own stock transfer agent. Consequently, as president of the company, Pullen was personally familiar with almost all sales of *68 Central American stock during that period. In July 1957, Pullen paid $30 per share in cash to George McCleskey for 500 shares of Central American stock. This was Pullen's last purchase of stock prior to September 9, 1957, when he first sold shares to petitioner. In 1957, Pullen was the only owner of Central American stock who had as many as 5,000 shares available for sale. Petitioner purchased 5,006 shares of Central American stock from Pullen on September 9, 1957, for $30 per share. Petitioner made its second purchase of Central American stock, amounting to 6,400 shares, from Pullen on April 30, 1958, for $30 per share. As the consideration for its initial purchase of 5,006 shares of stock from Pullen, the petitioner executed and delivered to Pullen its promissory note dated September 9, 1957, in the principal sum of $150,180 bearing interest at 5 percent per annum and due in three installments extending over two years. Petitioner commenced doing business in 1957 out of its secretary's office in the Central American Building. In October 1957, petitioner made sales of Central American shares through Clint Hicks, a licensed broker, at $32.50 per share to persons who were under *69 no compulsion to buy. Petitioner likewise was under no compulsion to sell. Petitioner sold Central American stock for a small down payment and notes bearing interest at 6 percent per annum. Petitioner paid Pullen 5 percent interest on its purchase money notes and charged 6 percent on its loans and deferred sales contracts. Petitioner's next purchase of Central American stock immediately following September 9, 1957, was 50 shares purchased from Lubbock Christian College on February 13, 1958, for $30 per share. Its next purchase on March 3, 1958 was 103 1/4 shares from Central American at $30 per share. Neither of these sellers owned any stock in petitioner. Between September 9, 1957, and December 31, 1957, the petitioner made sales of 200 shares of Central American stock at $30 and 200 shares at $32.50. As the consideration for its purchase of 6,400 shares from Pullen, the petitioner executed and delivered its promissory note dated April 25, 1958, in the principal sum of $192,000 with interest at 5 percent per annum payable in three installments extending over two years. When Pullen sold 6,400 shares of Central American stock to petitioner on April 30, 1958, he lost the controlling *70 interest in Central American which he never regained. In January, February, March and April of 1958, petitioner sold shares as follows: 425 shares at
$30.00
100 shares at
$31.50
9,995 shares at
$32.50
Two sales made by petitioner at $30 per share between November 1957 and February 1958, were made to influential individuals who helped to promote petitioner's subsequent sale of Central American stock in their local communities. Petitioner sold no shares of Central American stock for less than $30 per share. However, in March 1958, a 5 percent stock dividend reduced petitioner's basis in its remaining Central American stock below its $30 per share cost. Petitioner's next purchase of Central American stock following its purchase at $30 from Pullen on April 30, 1958, was on June 10, 1958, when it purchased 36 shares from Central American at $32.50 per share. Later in June, August, November and December of that year, petitioner purchased shares from various selles at $32.50 per share. From May 1958 through July 1959, petitioners sold shares as follows: 200 shares at
$30.00
15 shares at
31.50
3,661 shares at
32.50
5,877 shares at
35.00
100 shares at
35.75
4,025 shares at
36.00
*71 On June 8, 1959, petitioner purchased 1,081 shares of Central American stock from Pullen for $31.50 per share. And, on September 17, 1959, petitioner purchased 1,360 shares of Central American stock from Pullen for $32.50 per share. From its inception in 1957 through 1962, petitioner has carried on the same business operation. Petitioner has profited by the rise in the value and price of Central American shares owned by it and by interest received on its deferred sales contract. Petitioner's Federal income tax returns for its fiscal years ended June 30, 1958 through June 30, 1962 disclose stock sales and gross profit from sales as follows: Cost
of Goods
Gross
Gross Sales
Sold
Profit
1958
$142,437.50
$132,600.00
$ 9,837.50
1959
404,607.50
343,274.97
61,332.53
1960
257,041.00
215,042.78
41,998.22
1961
155,344.28
109,659.41
45,684.87
1962
149,186.26
108,200.63
40,985.63
Petitioner's Federal income tax returns for its fiscal years ended June 30, 1958, through June 30, 1962, disclose net loss and income from current operations as follows: 1958
($ 2,333.17)
1959
16,344.83
1960
19,305.87
1961
10,251.68
1962
21,972.26
*72 Pullen has been in the life insurance business almost continuously since 1934. He has been the chairman of Central American's investment committee since 1953, and in that capacity has personally examined and recommended the purchase of more than $300,000 of life insurance company stocks for Central American investment. He was also personally familiar with 95 percent of the sales of Central American stock made from 1953 through 1957 and the prices at which those sales occurred. From time to time through 1957 Pullen personally made numerous purchases of Central American stock at the asking price of needy or dissatisfied shareholders. In Pullen's opinion Central American stock had a fair market value in excess of $30 per share on September 9, 1957 and April 30, 1958. In his statutory notice of deficiency dated January 19, 1962, the respondent gave the following explanation for his adjustments: It is determined that your purchases of Central American Life Insurance stock from your controlling stockholder in 1957, 1958 and 1959 do not represent arm's length transactions and that the fair market value of such stock was not in excess of $20.00 per share. Therefore, your taxable income *73 has been increased by $43,850 [and $70,210.00 and $31,431.50] for your taxable year ended June 30, 1958 [1959 and 1960]. Opinion Relying on section 1012, [1] Internal Revenue Code of 1954, petitioner contends that, as a matter of law, the prices it paid for Central American stock represent its basis. Respondent counters with the two-fold argument that petitioner is not entitled to use cost as its basis because the purchases were not at arm's length and that the fair market value of the stock was not in excess of $20 per share when purchased. We agree with the petitioner. Whether the four purchases from Pullen were arm's length transactions is a question of fact to be decided on the evidence *74 presented. The test of "arm's length transaction" is basically whether the transaction was fair and reasonable. Cf. Differential Steel Car Co., 16 T.C. 413 (1951). A "fair consideration" reflects arm's length dealings. See Palm Beach Aero Corp., 17 T.C. 1169 (1952); Frank v. International Canadian Corp., 308 F. 2d 520, 529 (C.A. 9, 1962). It is not contended by the respondent that petitioner was not a valid entity actively protecting its own business interests in all of its dealings. To argue that the petitioner was a "mere agent" or "alter ego" of Pullen would, of course, be directly contrary to our opinion in Leon B. Pullen, T.C. Memo. 1963-20. [2] Nor is there any suggestion that tax avoidance was contemplated or intended. Consequently, if the petitioner purchased Pullen's Central American stock at a fair price and on such terms as enabled it to profit therefrom, the purchases were at arm's length. Viewing the whole record, we are convinced that the petitioner paid Pullen reasonable prices in bona fide purchases. See Aqualane Shores, Inc., 30 T.C. 519, 527 (1958). *75 The fact that "the ownership and operation of the properties were beneficial to the purchaser in the conduct of its business" is a factor in determining whether the purchases were at arm's length. J. E. Vincent, 19 T.C. 501, 503 (1952), affd. in part 212 F. 2d 52 (C.A. 4, 1954) certiorari denied 348 U.S. 828 (1954). Here the petitioner was able to build a successful, widely held business, from its stock purchases. This demonstrates, at least from hindsight, that such purchases were at a reasonable price and for the petitioner's benefit. The record shows that the petitioner realized, in all but the first year of its operation, continuous and substantial profits as a result of its purchases from Pullen and others. We are satisfied that the fair market value of the stock purchased from Pullen was in excess of the $20 per share asserted by the respondent. This is clearly demonstrated by prior sales of Central American stock, subsequent sales, and ample evidence of fair market value at $30 per share, all of which are included in our Findings of Fact. Respondent has cited several cases involving sham transactions based upon tax avoidance motives; *76 loss deductions claimed on the sale of property intentionally acquired for a grossly excessive price; or determination of fair market value by recent sales except where the buyers had no knowledge of value, were pressured into buying or represented a limited and privileged class. We have read and considered such cases as J. E. Vincent, supra; Mountain Wholesale Co., Inc., 17 T.C. 870 (1951); Pierre S. du Pont, 37 B.T.A. 1198 (1938), affd. 118 F. 2d 544, (C.C.A. 3, 1941), certiorari denied 314 U.S. 623 (1941); G.U.R. Co., 41 B.T.A. 223 (1940), affd. 117 F. 2d 187 (C.C.A. 7, 1941); TennesseeProducts Corp. v. United States, 107 F. Supp. 578 (Ct. Cls., 1952); Emanuel N. (Manny) Kolkey, 27 T.C. 37 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958); Gillette Rubber Co., 31 B.T.A. 483 (1934); Pennsylvania Indemnity Co., 30 B.T.A. 413 (1934) affd. 77 F. 2d 92 (C.C.A. 3, 1935), certiorari denied 296 U.S. 588 (1935); Majestic Securities Corp., 42 B.T.A. 698 (1940), affd. 120 F. 2d 12 (C.C. *77 A. 8, 1941); and Biltmore Homes, Inc. v. Commissioner, 288 F. 2d 336 (C.A. 4, 1961), affirming a Memorandum Opinion of this Court. In our judgment all of these cases are distinguishable on their facts from the instant case. Here the petitioner has introduced evidence to demonstrate that its transactions with Pullen were reasonable and fair. They were bargains struck in good faith and in a bona fide effort to establish a price based on fair market value. Petitioner has proved that the transactions were profitable, were essential to its business, and were on the only terms possible and in the volume necessary to its financing and operation. Petitioner has established to our satisfaction that strangers, as well as "insiders," were willing to buy Central American stock at prices equal to or in excess of those paid to Pullen. Accordingly, it is our view that the petitioner's transactions with Pullen were at arm's length. Since we regard these purchases as being within the class establishing basis by reference to cost, we give full effect to the provisions of section 1012 and hold that the prices paid by the petitioner to Pullen constitute its basis. Cf. Glasgow Village Development Corporation, 36 T.C. 691, 700-701 (1961). *78 Decision will be entered for the petitioner. Footnotes
1. SEC. 1012. BASIS OF PROPERTY - COST. The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.↩
2. There is a close relationship between the Pullen case and this one because they involve opposite sides of the same transactions. In Pullen we stated: "We have endeavored to make full Findings of Fact in the instant case and we do not think it is necessary to repeat them here at length. Suffice it to say, we do not think these facts show that P & R was a mere agent of petitioner as the Commissioner has determined in his deficiency notice. It was a corporation duly chartered under the laws of the State of Texas for business purposes stated in its charter. So far as we can see it has been operated within those purposes stated in its charter - it was still in business at the time of the hearing. Under the facts we cannot sustain respondent's determination in his deficiency notice that P & R acted merely as petitioner's agent. The Bank official who made loans for the Bank to petitioner in his purchases from time to time of Central American stock testified at some length at the hearing and made it plain that the Bank required petitioner to reduce his loans to the Bank and recommended to petitioner the organization of an independent corporation for the purchase and resale of some of petitioner's stock in Central American stock which was up as collateral security to the Bank. We think that this was one of the legitimate purposes for the organization and operation of P & R and that it must be treated as a separate taxable entity and not as the mere alter ego of petitioner." Implicit in our holding was the conclusion that the full amount paid by petitioner was consideration for Pullen's stock. Had we concluded otherwise, it would have been within our province to sustain, at least in part, the Commissioner's determination that money realized by Pullen represented ordinary income to him. Therefore, even though the doctrines of res judicata or collateral estoppel do not apply here, judicial consistency is better served if the tax consequences of petitioner's participation in the transaction relate in a consistent way to the long-term capital gain treatment earlier accorded Pullen.↩