I. Lewis Corporation (Formerly I. Lewis Cigar Manufacturing Company) v. Commissioner.
I. Lewis Corp. v. Commissioner
Docket No. 73793.
United States Tax Court
T.C. Memo 1963-13; 1963 Tax Ct. Memo LEXIS 330; 22 T.C.M. (CCH) 35; T.C.M. (RIA) 63013; January 15, 1963
*330 Israel Lewis was sole proprietor of a cigar business. He had acquired numerous brand names, trade-marks, and two patents at nominal cost. In 1910 he transferred his business having an equity of $450,000, exclusive of the above intangibles, to petitioner, a wholly-owned corporation, receiving $600,000 par value of preferred stock for his equity and for certain specific advertising expenses. He also received common stock of an aggregate par value of $2,600,000 purportedly for the trade-marks and brand names. Some of the brand names and trade-marks were abandoned in 1954. Held: 1. The abandoned items did not become worthless prior to their abandonment. 2. Respondent is not estopped to deny a valuation of trade-marks and brand names agreed upon in an administrative settlement of petitioner's excess profits tax liability for the years 1942 to 1945, inclusive. 3. Fair market value of abandoned assets as of the date of their transfer to petitioner determined. 4. Accrual of certain estimated 1955 vacation pay liability in 1954 was improper. Benjamin Alpert, Esq., 810 Broad St., Newark, N.J., and John E. Mahoney, Esq., for the petitioner. Henry L. Glenn, Esq., for the respondent. FORRESTER *331 Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in petitioner's income tax for the calendar years 1952 and 1954 in the respective amounts of $266,717.65 and $236,233.67. The year 1952 is in issue only because petitioner claims a loss for 1954 which it seeks to carry back to 1952. The issues remaining for our determination are (1) whether petitioner suffered a loss of $1,634,544.45 in 1954 because of the formal abandonment of certain trade-marks, patents and brand names, and (2) whether petitioner correctly accrued $19,500 of vacation pay on December 31, 1954. Findings of Fact Some of the facts have been stipulated and are so found. Petitioner, I. Lewis Corporation formerly known as I. Lewis Cigar Manufacturing Company, is a corporation organized on June 2, 1910, under the laws of the State of New Jersey with an authorized capital stock of $3,600,000, consisting of 10,000 shares of $100 par value preferred stock and 26,000 shares of $100 par value common stock. On July 31, 1956, petitioner's name was changed from J. Lewis Cigar Manufacturing Company to I. Lewis Corporation. Petitioner filed its 1952, 1953, and 1954 Federal income tax *332 returns on an accrual basis with the district director of internal revenue, Newark, New Jersey. Israel Lewis started in the cigar business about 1870, and operated it as a sole proprietorship until its incorporation in 1910. During that period he had absorbed various other cigar manufacturers, including Allen Tobacco Company, Interboro Cigar Company, and a cigar box manufacturer. In 1906 he acquired the cigar business of Morris Jacoby and Company, and among the assets purchased were many brand names, including the names John Harper and John Ruskin. The brand "Seidenberg" was purchased by Israel Lewis in 1906 for $250. The trade-mark "Nellie Melba" or "Flor de Melba" was purchased by petitioner for $1 in 1914. On June 2, 1910, petitioner acquired all the assets and assumed all the liabilities of the cigar manufacturing business conducted by Israel Lewis as sole proprietor, for which the petitioner, pursuant to a resolution of its board of directors, issued its capital stock for an aggregate par value of $3,200,000, consisting of 6,000 shares of preferred stock having an aggregate par value of $600,000, and 26,000 shares of common stock having an aggregate par value of $2,600,000. Shortly *333 after incorporation, additional preferred stock was sold to outsiders at $100 per share to bring in more capital. Some purchasers of the preferred stock received shares of common stock as a bonus. The proprietorship received preferred stock in return for its equity in the business and for $150,000 spent on advertising during the 15 months preceding March 31, 1910. Although the petitioner was incorporated on June 2, 1910, the transaction between it and Israel Lewis was deemed to have taken place at the close of business, March 31, 1910. The opening balance sheet of the petitioner and the closing balance sheet of the proprietorship were as follows: As per books of
Values assigned by
proprietorship
petitioner upon
Assets
March 31, 1910
acquisition
Real estate and buildings
$ 157,660.07
$ 157,660.07
Machinery and plant
110,382.66
110,382.66
Furniture and fixtures
3,984.52
3,048.79
Investments
66,385.72
66,385.72
Accounts and bills receivable
240,845.30
240,845.30
Inventories
832,200.05
832,200.05
Interest and insurance paid in advance
8,808.34
8,808.34
Cash
25,671.58
25,671.58
Brands, trade-marks, patents, formulae, etc.
2,600,000.00
150,000.00 * *334 Total assets
$1,445,938.24
$4,195,002.51
Liabilities and Capital
Bills payable
$ 769,392.82
$ 769,392.82
Accounts payable
152,242.00
152,242.00
Mortgages payable
69,010.00
69,010.00
Salaries and wages accrued
3,986.67
3,986.67
Taxes accrued
371.02
371.02
Total liabilities
$ 995,002.51
$ 995,002.51
Proprietorship
450,935.73
Preferred stock
600,000.00
Common stock
2,600,000.00
Total liabilities and capital
$1,445,938.24
$4,195,002.51 The assets so acquired by petitioner from the proprietorship and described on its books as "Brands, Trade-marks, Patents, Formulae, Etc." consisted in part of the trade-marks or trade names acquired from Morris Jacoby & Co., two patents, and the good will of the proprietorship. The entire business of Morris Jacoby & Co. had been purchased in 1906 by the I. Lewis proprietorship for $5,000. For the purpose of the settlement of the petitioner's excess profits tax liability for the years 1942 to 1945, inclusive, the respondent and the petitioner had agreed that the value of the intangible assets of the petitioner should be considered as paid-in capital for the purpose of determining average equity invested capital. Therefore, the excess profits tax credit of the petitioner for those years was computed to be $1,725,000, in accordance with the method set forth in the revenue agent's reports. The computation of the revenue *335 agent is set forth below: Common stock - valuation applied to
intangible assets
Total consideration received for
common stock
$2,475,000
Plus: Preferred stock issued for
specific brands
150,000
Total stock issued for
$2,625,000
Intangible assets
January 1, 1918, valuation applied
825,000
Excess under 1918 valuation
$1,800,000
Adjustment for 50% of value
$ 900,000
Plus January 1, 1918, valuation
825,000
Net valuation applied to intangi-
ble assets considered as paid-in
capital
$1,725,000 The above item reading "January 1, 1918, valuation applied" refers to the valuation of the petitioner's intangible assets made by the respondent in 1923 for the purpose of determining the amount of petitioner's invested capital, excess profits tax credit, and excess profits taxes for the year 1918, under section 326 of the Revenue Act of 1918 which provided, in short, that intangible property paid in for stock should be included in invested capital for excess profits tax purposes "in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation *336 outstanding * * * [at the beginning of the taxable year], whichever is lowest." No closing agreement pursuant to section 3760, 1939 Code, was ever made with respect to the value of the intangible assets of the petitioner for any purpose. I. Lewis Cigar Manufacturing Company received two patents from Israel Lewis at incorporation. No royalties were ever received on the patents and we find that they had no value. In ascertaining the value to be given to the intangibles transferred by the sole proprietorship to petitioner, its directors capitalized anticipated profits for a 10-year period. An audit dated May 11, 1910, prepared by Marwick, Mitchell & Co., revealed that the proprietorship had earned $107,387.36 for the 15-month period ending March 31, 1910, and $49,131.09 during the first 3 months of 1910, which earnings figures we find as facts. Based on the general pattern in the cigar industry that the first three months of a year are poor months, petitioner estimated its 1910 earnings to be $250,000 to $300,000, and based on this estimate, issued $3,200,000 of stock to I. Lewis in exchange for the business of the sole proprietorship. As of the date of incorporation, approximately 250 *337 of the brands transferred to petitioner by Israel Lewis had not been regularly used by him for some time and were considered to be of little value. Only about 26 of the brands so transferred then had substantial value. During the period 1908-1912, petitioner used musty Puerto Rican tobacco in its cigars. This tobacco required "doping," and diminished earnings throughout this period. The Puerto Rican tobacco used in the Puck brand ruined that brand. Commencing no later than 1912, petitioner restricted practically all of its sales to three brands, namely John Ruskin, Melba [1] and Seidenberg. The other brands were almost exclusively used as "seconds," although petitioner lost money on practically every brand designated as a "second" from 1910 or 1912 through 1954 and thereafter. The Retail Tobacco Dealers of America, Inc., published a handbook in which the brands of the various manufacturers are listed, along with their size, list price, and retail price. In letters to the Retail Tobacco Dealers of America, Inc., in which petitioner furnished a listing of its brands, the following was supplied: Date
Brand Sent In By Petitioner
3/28/45
S.Seidenberg & Co.'s, John Ruskin,
Flor de Melba, La Coronada, Jose
Rio
5/28/51
S. Seidenberg & Co.'s, John Ruskin,
Flor de Melba
9/18/52
S. Seidenberg & Co.'s, John Ruskin
Flor de Melba
4/28/53
S. Seidenberg & Co.'s, John Ruskin,
Flor de Melba,l4/16/54
S. Seidenberg & Co.'s, John Ruskin,
Flor de Melba
During *338 the years 1950-1954, petitioner sold relatively small quantities of various brands, sometimes shipping them without the consent of the customer. Some of these sales to customers without their consent were made merely to protect petitioner's rights to the brand names. All of these sales were of seconds, except for Melba, Ruskin, Seidenberg, and La Coronada. At a meeting of the board of directors of petitioner held on January 14, 1954, the following resolution was moved and adopted: … on advice of our auditors, J. H. Cohn & Company, a motion was made by Mr. Donald Lewis, seconded by Mr. Harry Lewis and carried to the effect that the good will of $2,750,000.00 carried on the books of the corporation should be written down to $1.00 as of December 1, 1953. There being no further business the meeting adjourned. Ross Dimm Secretary The letter from J. H. Cohn & Company, referred to in the resolution, bore the date of December 30, 1953, and advised the write-down of petitioner's "good-will, franchises, etc." to $1.00 in order to reduce its New Jersey corporate franchise tax. On December 27, 1954, the board of directors of the petitioner adopted a resolution discontinuing and abandoning some *339 374 trade-marks and brands specified therein. Of these marks and brands about 200 were acquired by the petitioner on June 17, 1910, from the sole proprietorship which in turn had acquired them from Jacoby. Prior to December 27, 1954, none of these marks or brands had been abandoned. On February 18, 1955, petitioner and Bayuk Cigars, Incorporated (hereinafter called Bayuk), entered into a purchase agreement whereby Bayuk purchased certain assets and the exclusive license to use certain trade-marks from petitioner. This purchase agreement provided in part as follows: 2. LEWIS agrees to sell to BAYUK and BAYUK agrees to purchase from LEWIS all of the following assets upon the terms and conditions hereinafter stated: * * *
(f) Brands and Trade-Marks. All brands and trade-marks, including the good-will of the business appertaining thereto, owned by LEWIS on the date of this Agreement, except the brands or trademarks licensed to BAYUK pursuant to the provisions of paragraph 11 hereof. * * *
9. (a) The purchase price of the brands or trade-marks referred to in paragraph 2(f) hereof shall be the sum of $1,000 and the same shall be payable in cash at the Closing Date. (b) BAYUK understands that *340 LEWIS has recently abandoned a large number of its brands or trade-marks, and that such abandoned brands or trade-marks are not being sold hereunder. (c) BAYUK agrees that no representation is made by LEWIS that any of the brands or trade-marks sold hereunder have been registered in the United States Patent Office or with any governmental authority or that the same are valid or owned exclusively by LEWIS. It is the sense of this sub-paragraph that LEWIS is conveying to BAYUK only such right, title and interest as it may have in and to such brands or trade-marks. * * *
11. At the closing BAYUK will enter into a License Agreement with LEWIS in the form of Exhibit "G" hereto annexed. Pursuant to this agreement, in February 1955, petitioner assigned its nine remaining trade-marks, except for "Flor de Melba," "John Ruskin," and "S. Seidenberg & Co.'s After Dinner" together with variations thereof, to Bayuk. One of these brands, John Harper, had been acquired by petitioner from Israel Lewis at the time of its incorporation in 1910. Petitioner and Bayuk entered into a license agreement granting Bayuk an exclusive license for 15 years to the brands and trade-marks excepted from the above assignment. *341 The license agreement gave Bayuk an option to buy all of petitioner's interest in all of said trade-marks after 10 years for $100,000 in cash. In the tax return filed by the petitioner for the calendar year 1954, there was deducted the amount of $1,264,313.80 representing abandonment of brands and trademarks. Petitioner arrived at said figure [2] by taking that percentage of $1,700,000 [3] which equaled the percentage of its sales for the period July through December 1911, which was attributable to the brands abandoned during 1954. The petitioner and the United Tobacco Workers Union, Local 302, CIO, entered into a contract dated February 11, 1954, covering present and future production and maintenance employees and teachers employed by the company in the Newark, New Jersey, plant. This contract provided in part: ARTICLE 8 Vacations 1. Every employee, on July 1st, 1954, who has worked for the *342 Company for a period of six (6) months or more from July 1st, 1953, shall receive a one (1) week vacation without pay, and shall also receive from the Company on or before July 1st, 1954 a bonus equal to the percentage hereinafter stated of said employee's earnings during the year ending June 1st, 1954: a. Employees continuously in the employ of the Company in excess of six (6) months, but not over one (1) year, two per cent (2%) of said employees earnings. b. Employees continuously in the employ of the Company in excess of one (1) year, but not over three (3) years, three per cent (3%) of said employees earnings. c. Employees continuously in the employ of the Company in excess of three (3) years, but not over five (5) years, three and one-half per cent (3 1/2%) of said employees earnings. d. Employees continuously in the employ of the Company in excess of five (5) years, four per-cent (4%) of said employees earnings. e. Teachers with the Company over five (5) years shall receive a bonus equal to four and one-half per cent (4 1/2%) of their earnings. It is agreed that it is the intention of the parties hereto that for an employee to be entitled to the vacation and bonus hereinbefore *343 granted, such employee shall be employed by the Company on the 1st day of July, 1954; provided, however, that in the event an employee is laid off or discharged for reasons other than due cause on or before July 1st, 1954, and would otherwise be entitled to the vacation bonus aforementioned, said employee shall receive, on discharge, the percentage sum of his earnings aforementioned for his carnings since July 1st, 1953. Employees terminating their employment of their own volition prior to July 1st, 1954 are not to be entitled to a vacation bonus. * * *
ARTICLE 19 The agreement supersedes the Contract made between the parties dated January 12th, 1953 and this present contract shall remain in effect in all respects until December 31st, 1954 and in all respects except wages until December 31st, 1955. The petitioner and Local No. 136 of the Cigar Makers International Union of America, AFL, entered into a contract dated February 1, 1954, with regard to the petitioner's employees in its plant located at Steelton, Pennsylvania. This contract provided in part: 8. (a) Except as hereinafter limited, every employee normally employed on a 40 hour work week basis who, on May 31st, 1954 has been *344 continuously employed by the Company for a period of one year or more, but less than five years in the 12 months immediately preceding May 31, 1954, shall receive a vacation pay equivalent to 40 hours at his rate of earnings, provided however, that employees normally employed on less than a 40 hour week shall in lieu of the one week's pay, receive a pay in a sum equivalent to their hourly rate of pay times 30 hours. 8. (b) Except as herein limited every employee normally employed on a 40 hour week basis, who on May 31st, 1954, has been continuously employed by the Company for a period of 5 years or more in the 12 months immediately preceding May 31st, 1954, shall receive a vacation pay equivalent to 80 hours at his rate of earnings. Except as herein limited employees normally employed on less than a 40 hour week basis, who on May 31st, 1954 have been continuously employed by the Company for a period of 5 years or more in the 12 months immediately preceding May 31st, 1954 shall receive a vacation pay equal to 60 hours at his hourly rate of earnings. 8. (c) Every employee on May 31st, 1954 (except as hereafter provided) who has been continuously employed by the Company for a period of *345 six months or more, but less than one year and who has not been absert more than thirty (30) days in the six (6) months immediately preceding May 31, 1954 shall receive a vacation of one-half week with pay in a sum equivalent to 2% of his total earnings. * * *
8. (f) Employees who have been continuously employed by the Company for more than six months but less than five years as hereinbefore provided, who have been absent for reasons other than illness or Bona Fide Union activities as hereinbefore provided for more than 60 days in the year immediately preceding May 31st of the year in question, shall not be entitled to any vacation apy for that year. * * *
8. (i) Employees who have been continuously employed by the Company for a period of 5 years or more, as herein provided, who have been absent for reasons other than illness, approved leaves of absence, or Bona Fide Union activities, as hereinbefore provided, for more than 60 days in the year immediately preceding June 1st of the year in question shall receive instead of the 80 hours or 60 hours vacation pay, as hereinbefore provided, a vacation pay of 40 hours or 30 hours vacation pay, as hereinbefore provided for the year in question; *346 and provided further said persons have not lost their employment status by reason of unexcused absences as provided in Paragraph 5(c) or for any other cause. * * *
18. It is mutually understood and agreed that this agreement shall supersede and take the place of the agreement now in effect and shall terminate on the 31st day of January 1955, and subject to the law then governing labor and management relationship shall be renewed thereafter automatically from year to year, except and unless either party hereto shall serve notice in writing of an intended change, alteration or cancellation, not less than sixty (60) days prior to the expiration date. At the end of 1954 petitioner accrued $19,500 as a liability for the vacation pay to be paid during 1955. The amount of the accrual was based on the vacation payments made in June 1954, with adjustments for reduction in the number of employees. Thirty thousand dollars of vacation pay was paid by petitioner in 1954 to its employees in its Newark plant. The petitioner took a deduction in its 1954 income tax return in the amount of $14,000 for vacation pay payments to be made in 1955 to those employees. Vacation pay of $12,000 was paid by petitioner *347 in 1954 to its employees in its Steelton plant. The petitioner took a deduction in its 1954 income tax return in the amount of $5,500 for vacation pay payments to be made in 1955 to those employees. Petitioner also deducted the actual 1954 payments in its 1954 income tax return. Ultimate Findings of Fact The common stock of petitioner exchanged for the brands, trade-marks, etc. in 1910 had no ascertainable fair market value at that time. None of petitioner's brands and trademarks were worthless at any time prior to 1954. The value of the brands, trade-marks, and patents as of the date of their transfer to petitioner in 1910 was $645,000, and the value at that time of those ultimately abandoned in 1954 was $540,000. [4] *348 Opinion Issue 1 Respondent has disallowed petitioner's claimed loss deduction [5] *349 in the year 1954 for abandonment of brands, trade-marks, and trade names because (1) no loss was sustained during 1954, and (2) even if a loss were sustained in 1954, petitioner has failed to prove the amount thereof. Petitioner argues that its formal abandonment of the brands and trade-marks in 1954 caused a loss to be realized, and that the amount of the loss was $1,634,544.45, the cost basis of the abandoned items. [6] Respondent's first argument is that 1954 is not the proper year in which any loss was realized. He cites his regulations [7] as authority for requiring an *350 identifiable event which signifies that the property has then become worthless. He concludes that the formal abandonment in 1954 is not such an event citing section 1.165-2(a), Income Tax Regs.[8] *351 Respondent cites cases in which a loss was held to be realized prior to the divestment by the taxpayer of the loss property. In United States v. White Dental Co., 274 U.S. 398 (1927), taxpayer's German subsidiary's assets were sequestered by Germany in 1918. Taxpayer deducted in 1918 its investment in said subsidiary, and this deduction was ultimately sustained. In 1924 taxpayer had actually received a $70,000 award from the Mixed Claims Commission and had received $6,000 in 1922 upon the sale of the subsidiary's tangible assets and lease. The Supreme Court held that the 1918 seizure was an event establishing the loss, saying that the taxpayer need not be "an incorrigible optimist." The Court laid down no rule; it said merely that the transaction completing *352 the loss was the seizure, despite the later recovery. In C. C. Harmon, 1 T.C. 40 (1942), reversed on other grounds, 323 U.S. 44 (1944), taxpayer had interests in oil and gas wells which proved dry and commercially unproductive in 1939. Geological opinion and data showed that the royalty interests involved were worthless in 1939 and a deduction was disallowed for 1940 when taxpayer executed quit-claim deeds divesting himself of all interests in the wells. We said that for tax purposes worthlessness occurs: (p. 56) * * * upon the happening of some event which results in the loss of its sale value in the ordinary channels of trade and would cause a prudent and informed business man to eliminate it from the asset side of his balance sheet. * * * Petitioner relies on cases denying loss deductions prior to some such event. In Beus v. Commissioner, 261 F. 2d 176 (C.A. 9, 1958), affirming 28 T.C. 1133, taxpayer began using well water on his farm and attempted to deduct the cost of his irrigation system in the year of change. This deduction was denied because no abandonment had been shown. Indeed, a later minor use of the system was made, although the court stated that mere nonuse is not *353 an abandonment. Numerous cases reiterate the proposition that, absent an identifiable event of abandonment, mere nonuse of property is not equivalent to an abandonment of it, especially where the property is not disposed of and might possibly become productive and/or profitable in the future. International Ed. Pub. Co. v. Commissioner, 79 F. 2d 343 (C.A. 3, 1935), (concession to use foreign texts in Japan); Boston Elevated Railway Co., 16 T.C. 1084 (1951), affirmed on other grounds 196 F. 2d 923 (C.A. 1, 1952), (railway tracks no longer in use); W. B. Davis & Son, Inc., 5 T.C. 1195, 1219 (1945), (stored outdated machines); United States v. Huntington Laboratories, 82 F. 2d 356 (C.A. 7, 1936), (formulae, thought worthless, kept in a safe). In the above cases the courts have looked for an identifiable event such as a sale, an abandonment, physical destruction, or other unequivocal disposition of the property as an element necessary to sustain the claimed loss deduction. In Citizens Bank of Weston v. Commissioner, 252 F. 2d 425 (C.A. 4, 1958), affirming 28 T.C. 717 (1957), the basement of taxpayer's bank building was flooded and was thereby rendered unusable. Taxpayer claimed *354 a loss deduction for this loss of value of its building. The Fourth Circuit defined the issue as "whether there has been such a final and irretrievable relinquishment as to entitle the owner to a deduction under the law." In denying the deduction before it, the court added: (p. 428) We need not here spell out in what other circumstances the utter hopelessness of any future use of property may become so manifest, * * * as to call for a conclusion of permanent abandonment. * * * Applying the above standards we find that any loss with respect to the worthlessness of petitioner's brands and trade-marks was realized in 1954. Admittedly the formal abandonment occurred then. Prior thereto sporadic sales of various brands had been made. Future use of the brands was no less likely than that of the concession in International Ed. Pub. Co., supra; of the formulae in Huntington Laboratories, supra; or of the machines in W. B. Davis & Son, Inc., supra. Although most of these brands were not profitable at any time, we hold that they were not worthless prior to 1954 and that any loss from their abandonment was realized during that year. Petitioner's argument as to the amount of loss is that although *355 the brands and trademarks were acquired by petitioner for $2,600,000 par value of its common stock and $150,000 par value of its preferred, petitioner feels estopped by its settlement of its excess profits tax liability which valued the intangibles at $1,725,000. By eliminating brands not abandoned (in proportion to total sales in the last half of 1911) it concludes that the cost of the abandoned brands was $1,634,544.45, and that this amount constitutes its loss on said brands. Petitioner also seeks to estop respondent (because of the excess profits tax settlement) from denying that the fair market value of the brands and trade-marks transferred to petitioner in 1910 was at least $1,725,000. Petitioner has not pleaded estoppel nor has it even attempted to show detrimental reliance, an essential element. Lodi Iron Works, Inc., 29 T.C. 696, 701-702 (1958). In addition, in a case in which respondent, in an excess profits tax dispute, sought to estop a taxpayer as to the value paid in for certain property because of its acceptance of the Commissioner's figure for depletion and depreciation for 22 prior years, the Court of Claims, in TennesseeProducts Corp. v. United States, 107 F. Supp. 578, 587 *356 (Ct. Cl., 1952), said in rejecting the claimed estoppel: It is well established that an administrative determination by the Commissioner of the value of property for the purpose of one tax statute or for the purpose of one taxable year, is not determinative of the value of that property for the purpose of another tax statute or of a different taxable year. * * * See also Fardale Corporation v. United States, 175 F. Supp. 175 (Ct. Cl., 1959); Carney Coal Co., 10 B.T.A. 1397, 1404 (1928). Petitioner seems to believe that respondent made certain admissions in the excess profits tax negotiations, which are still binding. However, even assuming that admissions were made by respondent, it is highly questionable whether an admission of a fact made solely in order to compromise a disputed liability is even admissible, much less binding. West v. Smith, 101 U.S. 263 (1879); cf. Factor v. Commissioner, 281 F. 2d 100, 125-128 (C.A. 9, 1960). We therefore hold that respondent (or, for that matter petitioner) is not estopped to deny the $1,725,000 valuation of the intangibles received by petitioner from Israel Lewis in 1910 because of the prior settlement of the excess profits tax dispute, *357 and that such settlement is at best merely indicative of the 1910 value of the intangibles. Although petitioner feels itself estopped to deny the $1,725,000 valuation, its argument assumes a value of $2,750,000 for the intangibles, based on the stock, common and preferred, transferred to Israel Lewis in 1910. Of this latter sum, $150,000 represents the capitalization of advertising expenses for the "Cob" and "Puck" brands during the 15 months preceding March 31, 1910, so that petitioner's theory indicates a value of $2,600,000. In support of this valuation petitioner introduced in evidence a report of Marwick, Michell & Co. to show purported earnings of approximately $58,000 for the year 1909 and $49,000 for the first quarter of 1910, even though the $150,000 was spent on advertising during this period. Since first-quarter earnings are relatively low in the cigar business, petitioner's directors estimated its 1910 profit at between $250,000 and $300,000, and capitalized this over a 10-year period to arrive at the valuation of the intangibles as shown on petitioner's books. If this had been a transaction between strangers, such valuations so agreed upon would be extremely persuasive, *358 but the record contains evidence strongly suggesting that the aforementioned figure is inaccurate. Harry Lewis, son of Israel Lewis and president of petitioner from 1924 to 1955, testified that he and certain other purchasers of the preferred stock which petitioner sold publicly in 1910 received shares of common stock free as a bonus when they purchased shares of preferred at par. Although the witness did not know why or how the common was distributed as a bonus to purchasers of the preferred, he did remember that many such purchasers did receive common stock in addition, implying that the common stock was not worth par value. In addition, the report of Marwick, Mitchell & Co. refers only to petitioner's Newark plant and does not cover the New York operations. We are therefore unable to verify the method of valuation used by petitioner in 1910. In fact petitioner lost $105,311.01 during 1910. It earned $1,521.95 in 1911 and $54,928.84 in 1912 (before minimal taxes). After 1912 its business was almost entirely confined to three brands, Ruskin, Melba, and Seidenberg, none of which was among the abandoned brands. Although the low earnings in 1908-1912 were in part due to the use of musty *359 Puerto Rican tobacco, the brands abandoned in 1954 never earned any significant amounts of income except for the Cob brand. In addition, the evidence on Israel Lewis' cost indicates that 201 of the abandoned brands were purchased (along with a factory and the rest of a business) in 1906 for only $5,000. Petitioner claims that the "Cob" brand earned $100,000 in the year prior to incorporation, and therefore was worth at least $1,000,000. This brand constituted the larger part of the proprietorship's business, and was the only substantial profitable brand during 1909. The Marwick, Mitchell & Co. report relied upon by petitioner indicates a profit of $107,387.36 for the 15 months ended March 31, 1910, and a net profit for 1909 of $58,256.27. Petitioner listed its "Cob" brand as an asset valued at $150,000 (the cost of advertising in 1909-1910) on its books from incorporation until at least 1920, suggesting that this brand was not included in the "Brands, Trademarks, Patents, Etc." account carried on the books at $2,600,000. We are thus unable to agree with the valuation of the intangibles used by petitioner in 1910. We also note that the partnership had no good will account, and respondent *360 contends that part of the $2,600,000 represented good will. Petitioner, on the other hand, suggests that poor management caused a devaluation of the brands, etc. to $1,725,000, and that there was "bad will" or at least an offset to good will due to mismanagement. We have considered the meager evidence on this point in arriving at our ultimate findings. Respondent argues that the amount of loss is to be limited by Israel Lewis' basis in the abandoned brands. His argument is that no transferee ever receives a higher basis for assets received in a transfer unless the transferor recognizes gain on the transfer. Although the 1910 transfer was by its very date nontaxable, respondent argues that it would have been nontaxable if occurring between March 1, 1913, and December 31, 1920. [9] He concludes that the former date is also insignificant for losses contrasting section 1053 which measures gain on property acquired before March 1, 1913, by cost or fair market value on March 1, 1913, whichever is higher. Since Israel Lewis, as an individual, could not under any circumstances *361 be subject to any personal income tax in 1910, we cannot accept respondent's argument, intriguing though it may be. Also, we find no provision in the Internal Revenue Code overriding section 1012, and thus petitioner's basis in the abandoned brands is its cost, measured by the fair market value of its stock issued therefor, or in the absence of any market value, the value of the brands transferred. Since we have not been able to ascertain any fair market value for petitioner's common stock in 1910, we have considered the entire record and valued the abandoned brands at $540,000 as of the date of their transfer to petitioner, and this is the amount of the allowable loss in 1954. We note that during the 15 months preceding incorporation, $150,000 was spent on advertising of brands included among those abandoned in 1954. Regardless of the ultimate effect of this expenditure, the value of the brands as of March 31, 1910, would reflect the expense. Israel Lewis had an equity of approximately $450,000 in his proprietorship without assigning any value to its brands, yet it earned over $107,000 in 15 months. This abnormal return suggests that his trade names were indeed of some value, and *362 our valuation of them indicates a return more in accord with business reality, especially in light of the relative importance of brand names in the cigar business. The support for the $2,600,000 figure is a book entry based on an incomplete income statement, possibly inflated to further the planned public sale of petitioner's preferred stock. The $1,725,000 figure is a compromise, and we are unable to ascertain any other support for that figure. The cost basis to Israel Lewis of the brands is incomplete, but would seem to be extremely nominal, and it would not indicate any value as developed by the sole proprietorship. Few of the approximately 350 brands ever earned noticeable amounts of income. Their cost was minimal and their aggregate valuation for the settlement of petitioner's excess profits tax liability included the value of John Ruskin, one of the three profitable brands and one which was not abandoned in 1954. We have therefore taken these factors into account in making our findings. We do not find Webster Investors, Inc. v. Commissioner, 291 F. 2d 192 (.A. 2, 1961), affirming a Memorandum Opinion of this Court, to be contrary. In that case the value of the intangibles as *363 of 1916 was not challenged, and the only issue was what part of the agreed total was allocable to the specific brand sold. In the instant case the question is what is the value of the intangibles in 1910. Indeed, in Webster Investors value was attributed to the business as a going concern (i.e., good will) and the ultimate value of the brand was 50 percent of that asserted by the taxpayer. Issue 2 Respondent contests the propriety of petitioner's December 31, 1954, accrual of vacation pay. We need not reach several questions herein involved since the petitioner changed his method of accounting regarding said vacation pay without the required approval of the Commissioner. Section 446(e) provides: (e) Requirement Respecting Change of Accounting Method. - Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate. The relevant regulations are: § 1.446-1. General rule for methods of accounting. * * *
(e) Requirement respecting the adoption or change *364 of accounting method. (1) * * * (2)(i) Except as otherwise expressly provided in chapter 1 of the Code and the regulations thereunder, a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. A change in the method of accounting includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item. Consent must be secured whether or not a taxpayer regards the method from which he desires to change to be proper. Thus, a taxpayer may not compute his taxable income under a method of accounting different from that previously used by him unless such consent is secured. (ii) Examples of changes requiring consent are: A change from the cash receipts and disbursements method to an accrual method, or vice versa; * * * or a change in the treatment of any other items of income or expense, where material. Rev. Rul. 59-285, 1959-2 C.B. 458, 460, explicitly states the following: Accordingly, under the 1939 Code as well as under the 1954 Code, taxpayers employing the accrual method of accounting, *365 who have consistently deducted a material item in the year paid rather than the year accrued, must obtain the prior consent of the Commissioner before changing such method of accounting, whether or not the taxpayer regards the method from which he desires to change to be proper. See also Rev. Rul. 61-7, 1961-1 C.B. 166, which notes that "taxpayers otherwise on the accrual method who account for taxes on the cash method will be permitted a deduction only for taxes actually paid during their calendar year." Cf. Rev. Rul. 58-24, 1958-1 C.B. 318. Administrative interpretations which are not clearly inconsistent with the statute should be followed. Corn Products Co. v. Commissioner, 350 U.S. 46. In commenting on section 446(e) the relevant House of Representatives report stated as follows: (H. Rept. No. 1337, 83d Cong., 2d Sess., p. A158 (1954)) Subsection (e) codifies existing regulations. A change in the method of accounting includes a change in the general method of accounting such as a change from the cash receipts and disbursements method to an accrual method, or vice versa, or a change from the cash or an accrual method to the long-term contract method, or vice versa. It also *366 includes a change in the treatment of a material item such as a change in the method of valuing inventory, or a change from an accrual method without estimating expenses to an accrual method with estimated expenses, or vice versa, or a change in the method of depreciating any property. A change in the method of accounting is a substantial change as distinguished for each change in the treatment of each item. In computing taxable income, a taxpayer who changes his general method of accounting or who treats material items inconsistently must obtain the consent of the Secretary or his delegate unless an express provision of this chapter permits such change at the election of the taxpayer without such consent. Viewing the record as a whole, we find that the $14,000 accrued vacation pay item for the Newark plant and the similar $5,500 item for the Steelton plant were "material" and significant items. Petitioner had previously deducted vacation pay on the cash method of accounting. Petitioner does not assert that reporting said vacation pay on the cash method of accounting was improper, and the record would not support such a contention. In 1954, petitioner deducted the vacation pay actually *367 paid for 1954 and, in a change of accounting method, also deducted a portion of the vacation pay which was to be payable in 1955. Section 446(e) and the applicable administrative regulations recognize that such a change in the accounting method of a material item might lead to a distortion of taxable income. Hence the consent procedure is available in order to allow adjustments which might mitigate any distortion. Brookshire v. Commissioner, 273 F. 2d 638 (C.A. 4, 1960), certiorari denied 363 U.S. 827. Petitioner did not apply for such consent. The bunching of the vacation pay deductions in 1954 led to a distortion of petitioner's reported income for 1954. Indeed, petitioner claimed a net operating loss carryback to 1952 which was partially based on the 1954 vacation pay deductions. We conclude that section 446(e) is applicable. See Brown v. Helvering, 291 U.S. 193; Commissioner v. O. Liquidating Corporation, 292 F. 2d 225 (C.A. 3, 1961), certiorari denied 368 U.S. 898, relied upon in Wright Contracting Co., 36 T.C. 620, 636, on appeal (C.A. 5); United States v. Ekberg, 291 F. 2d 913 (C.A. 8, 1961), certiorari denied 368 U.S. 920; Advertisers Exchange, Inc., 25 T.C. 1086, *368 affirmed per curiam 240 F. 2d 958 (C.A. 2, 1957); Bobrow Bros. v. Commissioner, 135 F. 2d 209 (C.A. 3, 1943), affirming on this issue but remanding on other grounds a Memorandum Opinion of the Board; Broida, Stone & Thomas, Inc. v. United States, 204 F. Supp. 841. American Can Co., 37 T.C. 198, 212, on appeal (C.A. 2), is distinquishable on two grounds. First, the instant case involves the 1954 Code which for the first time permits so-called hybrid methods of accounting. Section 446(c). American Can Co. involved the 1939 Code, and the Court's opinion at 215 noted that: The contrary view would in effect sanction hybrid accounting practices and would treat as a "system of accounting" a mixture of accrual and cash items. It seems all too clear that, regardless of the law under the 1954 Code, n8 no such hybrid systems are permissible under the 1939 Code or prior revenue laws. * * * [Footnote omitted.] Second, American Can Co. depended on a stipulated agreement between the parties which in effect removed the evil which section 446(e) prevents: (p. 218) Finally, it should be noted that allowing petitioner the claimed accrued expenses in 1953 will not result in any double deductions *369 for the vacation pay and State property tax items involved. The parties have stipulated that if petitioner should be allowed the deductions claimed, the expenses erroneously claimed on its 1953 return (which petitioner paid in 1953 but accrued in 1952) should not be allowed. * * * No such agreement is evident in the case at bar. Indeed, petitioner is claiming both the cash and accrual deductions for 1954. We find that the relevant vacation pay was a "material item" under the purview of section 1.446-1(e)(2)(i), Income Tax Regs. , and the applicable revenue rulings, We find that petitioner changed his accounting treatment of said material item. Petitioner has not sustained his burden of proof regarding his contention that the applicable labor union contracts required a change in accounting treatment from prior years. We therefore find improper petitioner's December 31, 1954, accrual of portions of its 1955 vacation pay liability. Decision will be entered under Rule 50. Footnotes
*. The $150,000 item represents the capitalization of advertising expenses incurred by the sole proprietorship during the period January 1, 1909, to March 31, 1910, $124,214.02 of which was expenses for advertising "Cobs" and $24,960.60 of which was spent in advertising "Puck."
1. This brand was acquired in 1914, as indicated above.↩
2. On brief this method of computation leads to a figure of $1,634,544.45, which is the amount of deduction petitioner now seeks. Its petition sought the amount of $2,750,000. We assume that the amount deducted on the return is no longer asserted to be accurate. ↩
3. So stipulated. See footnote 6, infra.↩
4. In arriving at this figure we have considered the entire record, especially the earnings during the period 1909 to March 31, 1910, inclusive, the relative importance of the abandoned brands in producing the income of the proprietorship and of petitioner during this period, and the available evidence of the value of the brands when purchased by Israel Lewis several years prior to 1910. We have given less significance to later years' income because of the use of musty tobacco in 1910, and because after 1912 sales were confined almost exclusively to brands other than those abandoned in 1954.
5. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. SEC. 1011. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016. SEC. 1012. BASIS OF PROPERTY - COST. The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). * * * All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated. ↩
6. Petitioner feels itself estopped to deny the valuation of $1,725,000 agreed to by it in the excess profits tax settlement. It is stipulated that in computing the deduction on its 1954 return petitioner used the base figure $1,700,000. However, its argument and the figure of $1,634,544.45 rely on the $1,725,000 valuation.↩
7. § 1.165-1 Losses. [Income Tax Regs.] (b) Nature of loss allowable. To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss. * * *
(d) Year of deduction. (1) A loss shall be allowed as a deduction under section 165(a)↩ only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year. 8. § 1.165-2 Obsolescence of nondepreciable property. (a) Allowance of deduction. A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a)↩ for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs.
9. Thereafter section 202(c)(3) of the Revenue Act of 1921 provided for nonrecognized transfers to controlled corporations.↩